IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.

ANTHONY IGHODARO,
                        Defendant.

_____

**REPORT AND RECOMMENDATION**

10-cr-351-RJA-JJM

        This case was referred to me by Hon. Richard J. Arcara for supervision of all pretrial proceedings [18].[1] Before me is defendant's motion to suppress physical evidence and statements [39].[2] An evidentiary hearing was held on September 12 and October 4, 2011 [54, 55], at which United States Customs and Border Protection ("CBP") Officers Andrew Hersee and Dylan MacNeil and Immigration and Customs Enforcement ("ICE") Special Agent Jason Siuda testified. The parties submitted post-hearing briefs [60, 61]. For the following reasons, I recommend that the motion be denied.

**BACKGROUND**

        Defendant is charged in a two-count Indictment ([17]) with unlawfully importing into the United States a substance containing 3,4-methylenedioxymethamphetamine ("MDMA") and 1-benzylpiperazine, Schedule I controlled substances, in violation of 21 U.S.C. §§952(a), 960(a)(1) and 960(b)(3) (id., Count 1), and with fraudulently importing MDMA and 1-

---

[1]     Bracketed references are to CM-ECF docket entries.

[2]     Defendant also filed omnibus motions ([22, 34]) seeking a variety of relief other than suppression, but has since advised my chambers that these motions are no longer in dispute and are therefore withdrawn, without prejudice to renewal.

benzylpiperazine contrary to law, in violating of 18 U.S.C. §545 (id., Count 2).  These charges arise from defendant's attempt to enter the United States at the Peace Bridge port of entry on July 25, 2010.

Officer Hersee encountered defendant at the port of entry at 5:45 p.m. that day ([54], pp. 14-15).  Defendant, a citizen of Canada, stated that the purpose for his entry into the United States was to go shopping at the Walden Galleria Mall (id., pp. 15, 18).  In response to questioning, he also stated that the vehicle he was driving was rented by his friend, but he did not have a rental agreement (id., pp. 15-16). A check of the vehicle's trunk did not reveal any contraband, but he was escorted to secondary inspection within approximately five minutes of the initial encounter "[d]ue to the nature of the subject's conveyance, a third-party rental is somewhat suspicious when traveling across an international border" (id., pp. 16, 22-23). Defendant was "very calm, very polite" while speaking to Officer Hersee, and remained compliant throughout their encounter (id., pp. 17, 23).

Officer MacNeil, the secondary inspection officer, testified that defendant was escorted by officers to a large waiting room in the secure area, which contained lavatories and a television (id., pp. 31-35).  Officer MacNeil asked defendant some initial pedigree questions (id., pp. 37-38).  Before speaking to defendant, Officer MacNeil had his passport and the referral slip, which contained the plate number, referring officer and lane of entry, but he could not recall whether the referral slip indicated the purpose of his referral (id., pp. 36-37, 46-47, 51-52).

"[N]ot very long" after first encountering defendant, Officer MacNeil received a radio communication from the officers conducting a search of defendant's vehicle, asking him to

perform an immediate pat-down search; he was not informed why the search was requested (id., pp., 38-39, 54-55).

As requested, Officer MacNeil conducted a pat-down of defendant in a holding cell where all pat-down searches are conducted (id., pp. 38-39, 57-58). During the course of the pat-down, he asked defendant to remove his belt and shoes (id., pp. 39-41, 58-59). No weapons were drawn during the pat-down search (id., p. 57). All of defendant's possessions, other than his clothing, was placed in an evidence bag outside of the cell (id., p. 59). The pat-down search revealed no contraband on defendant's person (id., pp. 41, 60).

Following the pat-down, at approximately 6:01 p.m. defendant was placed in handcuffs and directed to sit on a bench in the approximately six-by-eight foot holding cell (id., pp.41-43, 68-69). Thereafter, Officer MacNeil checked defendant's cell approximately every fifteen minutes to "make sure he did not need anything" and that he was not an "immediate danger to himself"; however, he did not speak to defendant further (id., pp. 43-44). While Officer MacNeil could not say for certain whether anyone else talked to defendant while he was in the holding cell, he did not observe anyone in the vicinity of the cell, and stated that according to protocol, once ICE is contacted to investigate, CBP ceases talking to the subject (id., pp. 43-45, 67-70).

SA Siuda arrived at the Peach Bridge at approximately 6:55 p.m. and proceeded to the secondary parking area, where he learned that six bags of a substance that tested positive for MDMA had been recovered from the bumper region of defendant's vehicle (id., pp. 75-76, 99).[3] At some point, he also examined two cell phones recovered from the vehicle (an iPhone and a

---

[3] MDMA is referred to as Ecstasy. [54], p. 109.

BlackBerry), but the iPhone was password protected, which prohibited him from seeing anything other than the fact that it had been receiving calls from a blocked number. He did not recall searching the BlackBerry, which did not require a password (id., pp. 77-78, 109-111, 121).

SA Greg Mango arrived to assist SA Siuda (the lead agent), and was updated on the matter (id., pp. 79, 107). SA Siuda introduced himself to defendant at the holding cell, and he and SA Mango escorted him to an interview room, where the interview commenced at 7:20 p.m. (id., pp. 81, 104-106, 111-112). In the interview room, SA Siuda showed defendant his credentials and obtained some biographical information from defendant, although he conceded that he already knew defendant's name, citizenship, and the fact that he was driving a rented vehicle (id., pp. 114-116). SA Siuda could not recall whether defendant remained in handcuffs during the interview (id., p. 107). He stated that defendant "seemed calm" , "compliant" and " in most cases . . . courteous as well" (id., p. 82).

SA Siuda advised defendant "that before we ask you any further questions, we have to advise you of your rights, because, you know, of the situation", but he "didn't go into details" (id., p. 82). He then read defendant his Miranda rights from a preprinted form (Gov. Ex. 1), and defendant was given the opportunity to read the form as well, before printing and signing his name on the form at 7:25 p.m. (id., pp. 82-85). They then posed questions to defendant, which he appeared to understand and answered (id., p. 85). Among the questions was "why would somebody be calling from a blocked number?", to which he responded that "it could be his sister" (id., p. 92).

He also signed a consent to search form for the iPhone and Blackberry (Gov. Ex. 2) after the form was read to him, and then he voluntarily provided the access code for the iPhone

-4-

after being asked (id., pp. 90-91, 96, 121). He was also asked and agreed to provide a written statement (id., pp. 91-93; Gov. Ex. 3). Following the consent to search and written statement, the agents granted defendant's request to contact a family member, but SA Mango "did most of the talking" by updating the family member on defendant's status (id., pp. 95-96). When the interview concluded, defendant was taken back to his holding cell (id., pp. 96-97).

Although defendant did not testify at the suppression hearing, he submitted a declaration ([42]) in which he adopted the factual statements made by his attorney in support of his suppression motion.[4] According to defendant, he was initially questioned for about 10 minutes before being taken to the holding cell, and when he was taken to the interview room, "[h]e responded to questions about the vehicle and was eventually told about the contraband that was found. He was coerced into writing a statement and eventually informed about *Miranda* warnings." Hayes Affirmation [39], ¶9.

## ANALYSIS

**A.     Suppression of Statements**

   **1.     Pre-Miranda Statements**

Defendant argues that he was subjected to three custodial interrogations prior to being advised of his Miranda rights: 1) Officer MacNeil's interrogation in the cell block; 2) SA Siuda's interrogation in the cell block; and 3) the interrogation by SAs Siuda and Mango in the interview room. Defendant's Post-Hearing Memorandum of Law [60], pp. 4-10.

---

[4]     Defendant's Declaration ([42]) attested to the veracity of factual arguments made by his counsel.

While conceding that defendant was in custody, the government notes that "defendant fails to point to any statement which could reasonably be construed as the product of custodial interrogation", and that "[r]outine booking questions concerning an arrestee's identity, date of birth, address, employment, marital status and other 'pedigree' information are not interrogation." Government's Post-Hearing Memorandum of Law [61], pp. 5-6.

Miranda warnings are required "in border interrogations when the questioning of the official becomes an interrogation that is custodial in nature and is one in which information is sought for the purpose of using it against a person in a criminal proceeding." United States v. Silva, 715 F.2d 43, 47–48 (2d Cir.1983). "[N]ot . . . all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." Rhode Island v. Innis, 446 U.S. 291, 299 (1980). An interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." Id. at 300. It must constitute "express questioning or its functional equivalent", including "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the subject." Id. at 300-301.

With this standard in mind, I will address each of three encounters upon which defendant relies.

### a. Officer MacNeil's Encounter with Defendant in the Cell Block

Officer MacNeil's testimony does not indicate that he interrogated defendant when he spoke to him during his pat-down search. Even those portions of Officer MacNeil's testimony relied upon by defendant support this conclusion:

> "Q. And as you're doing [the pat-down] you were talking to Mr. Ighodaro, right? . . .
>
> A. Correct. I would have talked to [defendant]. . . .
>
> Q. . . . He's talking to you as well, right?
>
> A. . . . [H]e was answering the questions, correct.
>
> Q. What questions?
>
> A. I recall . . . asking his name and more informing him what was going to be happening about the pat-down. *It wasn't necessarily a questioning. It was more of a so he had an understanding of what we were doing and why*." [54], pp. 62-63 (emphasis added).

The record indicates that Officer MacNeil's questions sought pedigree information, and "the collection of biographical or pedigree information through a law enforcement officer's questions . . . does not ordinarily implicate the prophylactic protections of *Miranda*, which are designed to protect a suspect only during investigative custodial interrogation." Rosa v. McCray, 396 F.3d 210, 221 (2d Cir.), cert. denied, 546 U.S. 889 (2005). There is nothing to suggest that Officer MacNeil's pedigree questions were intended to elicit an incriminating response. *Compare with* United States v. Valentine, 657 F.Supp.2d 388, 394 (W.D.N.Y. 2009) (Larimer, J.) ("the officers were not simply asking 'routine' questions to ascertain the identity of the person to whom they were speaking, and to make sure that they had not apprehended the wrong individual. They had a strong suspicion that 'Dean Gray' was an illegal alien in possession of fraudulent documents concerning his identity").

      **b.**      **SA Siuda and Mango's Encounter with Defendant in the Cell Block**

      Defendant relies on two aspects of SA Siuda's testimony to establish that defendant was interrogated in the cell block prior to being transported to the interview room. Defendant's Post-Hearing Memorandum of Law [60], p. 8.  He first relies on SA Sida's testimony that "[w]hen we made our acquaintance with Ighodaro, the first thing we typically do is ask him - - at this point we'll have a copy of his passport provided to us by CBP, and we'll just verify the information on the passport is correct.  The spelling of his first name, spelling of his last name, date of birth.  That's what I did in this situation as well" ([54], p. 80).  He also relies on SA Siuda's testimony that he advised defendant that "we have to advise you or your rights, because, you know, of the situation" (id., p. 82).  However, SA Siuda testified that these exchanges occurred while in the interview room (id., pp. 81-82), as opposed to the cell block, and defendant has not identified any other alleged questioning that he was subjected to by SAs Siuda or Mango in the cell block.

      Even if these exchanges *had* occurred in the cell block, neither aspect of SA Siuda's testimony demonstrates that he interrogated defendant prior to administering Miranda warnings.  There is nothing to suggest that SA Siuda's questioning directed at verifying the information on defendant's passport sought to elicit anything other than pedigree information. *See* Rosa, 396 F.3d at 221. There is also nothing in the record establishing that SA Siuda's statement "before we ask you any further questions, we have to advise you of your rights, because, you know, of the situation" ([54], p. 82) either elicited or was intended to elicit an incriminating response from defendant, given the fact that SA Siuda was commencing to provide defendant with Miranda warnings (id., pp. 82-83).

### c. Defendant's Encounter with SAs Siuda and Mango in the Interview Room

SA Siuda testified that during the five-minute interval between the commencement of the interview started and defendant's execution of the Miranda waiver form, he merely showed defendant his credentials, asked pedigree questions as discussed above, and then read defendant his Miranda rights before defendant waived those rights ([54], pp., 80-82, 112-117 ). Although defendant asserts that "he was coerced into writing a statement and eventually informed about *Miranda* warnings" (Hayes Affirmation [39], ¶9), "[a]bsent [defendant's] live testimony and the opportunity for cross-examination, the Court cannot assess his credibility or truthfulness. As a result, I credit the testimony of the live witnesses over the contents of defendant's affidavit where a conflict exists." United States v. Chisholm, 2008 WL 5453242, *2 (E.D.N.Y.2008), adopted as modified, 2009 WL 299313 (E.D.N.Y. 2009).

Defendant also argues that the repeated pedigree questions he was asked were tantamount to an interrogation. Defendant's Post-Hearing Memorandum of Law [60], p. 12 ("The agent claimed, that they, yet again, asked Mr. Ighodaro to verify his biographical information. This was after the agent received that confirmation from the CBP staff and based on the agent's own investigation. Undisputed, were the facts surrounding Mr. Ighodaro's arrested [*sic*]: his name, citizenship, vehicle rental and contraband were all known to the agents"). I disagree. "Although under some circumstances, repeated visits to a defendant who has invoked his right to remain silent may constitute interrogation . . . , this Court has uncovered no authority holding or suggesting that solicitation of pedigree information a second time runs afoul of the Fifth Amendment." United States v. Davis, 2011 WL 2936123, *8 (W.D.N.Y.

2011)(Payson, M.J.), report and recommendation adopted by 2011 WL 5570707 (W.D.N.Y. 2011)(Larimer, J.).

### 2. Post-Miranda Statements

Relying on Missouri v. Seibert, 542 U.S. 600 (2004), defendant argues that "the belated [Miranda] warnings were ineffectual, misleading and uninstructive" and that the "agents used a question first technique during their multi-tiered interrogation". Defendant's Post-Hearing Memorandum of Law [60], p. 14. The government responds that there is no factual support for defendant's claim that he was subjected to a two-step interrogation or that he did not knowingly and voluntarily waive his Miranda rights. Government's Post-Hearing Memorandum of Law [61], pp. 6-7.

As previously discussed, the record undermines any claim that defendant was interrogated prior to being advised of his Miranda rights. Moreover, even if it were determined that defendant's pre-Miranda questioning constituted an interrogation, there is nothing in the record to indicate that law enforcement deliberately implemented a two-step interrogation to circumvent defendant's Miranda rights. The benign pedigree questions posed to defendant before being Mirandized "stand[] in stark contrast to the *Seibert* case, where the defendant gave a full confession before receiving the warning and then was essentially cross-examined about her confession into a tape recorder after having been given the warning." United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007), cert. denied, 128 S. Ct. 1066 (2008).

### 3. Voluntariness of Defendant's Miranda Waiver

Defendant argues that his Miranda waiver was not voluntary since the agents' conduct "leading up to the signing of the waiver was directly aimed at undermining [his] will", and that "Agent Siuda's facially friendly and equally confusing 'we have to advise you of your rights, because you know, of the situation', would leave anyone confounded". Defendant's Post-Hearing Memorandum of Law [60], pp. 16-17.[5]

"To prove a valid [Miranda] waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right. United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" United States v. Male Juvenile, 121 F.3d 34, 39-40 (2d Cir. 1997)(*quoting* Moran v. Burbine, 475 U.S. 412, 421 (1986)).

"Factors relevant to the totality of the circumstances are: the characteristics of the accused, such as his experience, background, age and intelligence; the conditions of interrogation; and police conduct, such as physical abuse, handcuff restraint, and psychologically coercive tactics." United States v. Miller, 382 F.Supp.2d 350, 371 (N.D.N.Y. 2005)(*citing* Nelson v. Walker, 121 F.3d 828, 833 (2d Cir.1997); Green v. Scully, 850 F.2d 894, 901 (2d Cir.1988))

---

[5] I recognize that "a confession that is the product of governmental coercion must be suppressed regardless of whether *Miranda* has been complied with" United States v. Bout, 2011 WL 4389537, *3 (S.D.N.Y. 2011). However, here defendant argues only that his Miranda waiver was not voluntary.

Based upon the totality of the circumstances, I conclude that the government has established that defendant was properly advised of his Miranda rights when he was read his Miranda rights from a preprinted form (Gov. Ex. 1) and provided with the opportunity to read the form as well, before voluntarily waiving these rights ([54], pp. 82-85).  Nothing in the record indicates that defendant was induced to waive his Miranda rights by threats, promises or coercion.

I also do not find that SA's Siuda's statement before administering the Miranda warnings to defendant was confusing, nor is there is anything in the record from defendant indicating that he was confused by this statement.  According to SA Siuda, defendant seemed calm and courteous, and understood the questions that were posed to him. [54], pp. 82, 85.  Therefore, I recommend that defendant's motion to suppress his statements be denied.

**B.     Suppression of Physical Evidence**

Defendant argues that "[t]he totality of the circumstances . . . compels a finding that [defendant] was coerced into signing the consent form upon which the Government now relies to justify the cell phones' search. . . .   [H]andcuffed for an hour, stripped of his property, belt and shoes, [defendant] was in no position to voluntarily consent to signing the form. Moreover, Agent Siuda already searched the phones, was aware of the iPhone receiving call from a blocked number and presumably confronted the Defendant with that as a means to obtain the consent." Defendant's Post-Hearing Memorandum of Law [60], pp. 18-19.[6]  The government

---

[6]     Defendant has not moved to suppress the controlled substances recovered from the vehicle.

responds that "[t]he record . . . fails to support any finding of coercion in the execution of the consent form or of the consent." Government's Post-Hearing Memorandum of Law [61], p. 8. It also argues that "the search of the defendant was part of a routine border search of merchandise, as well as a search incident to arrest" (id., p. 7 n. 3).

The government bears the "burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

Based upon the totality of the circumstances, I conclude that defendant voluntarily consented to the search of the cell phones after being read the consent to search form ([54], p. 91; Gov. Ex. 2). There is no indication in the record that his consent was the product of coercion, threats or a show of force. "The fact that a person is in official custody, does not mean that he is incapable of giving his free and voluntary consent." United States v. Martin, 669 F.2d 73, 82 (2d Cir. 1982). Although the government offered no evidence that defendant was advised of the right to refuse consent, it "need not establish such knowledge as the sine qua non of an effective consent." Schneckloth, 412 U.S. at 227.

Alternatively, the government also argues that "[e]ven if the agents had not obtained the defendant's permission . . . the searches [of the cell phones] would still be considered part of a routine border search which did not require reasonable suspicion." Government's Memorandum of Law [43], p. 12 Government's Post-Hearing Memorandum of Law [61], p. 7 n.3. "It is well established that the government has broad powers to conduct

searches at the border even where . . . there is no reasonable suspicion that the prospective entrant has committed a crime . . . . 'Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant'". Tabbaa v. Chertoff, 509 F.3d 89, 97–98 (2d Cir.2007) (*quoting* United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985)).

Even if the border search is considered "non-routine", it is valid "if it is supported by reasonable suspicion". United States v. Irving, 452 F.3d 110, 124 (2d Cir.2006)."[F]actors that courts may consider in making the reasonable suspicion determination, includ[e] unusual conduct of the defendant, discovery of incriminating matter during routine searches, computerized information showing propensity to commit relevant crimes, or a suspicious itinerary." Id.

However, I need not address whether the search of the cell phones would be considered routine or non-routine, since reasonable suspicion to search the cell phones existed from the discovery of narcotics in defendant's vehicle, where the cell phones were recovered. Therefore, I recommend that defendant's motion to suppress physical evidence be denied.

**CONCLUSION**

For these reasons, I recommend that defendant's first motion to suppress statements and physical evidence [39] be denied. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by July 23, 2012 (applying the time frames set forth in Fed. R. Crim. P. ("Rules") 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara.

A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

**SO ORDERED**

DATED:     July 5, 2012

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge